Jane DOE, on behalf of herself and all other persons similarly situated, Plaintiff,

v.

Honorable Calvin L. RAMPTON, Individually and in his capacity as Governor of the State of Utah, and Honorable Vernon B. Romney, Individually and in his capacity as Attorney General of the State of Utah, Defendants.

No. C 217–73.

United States District Court, D. Utah, C. D.

Sept. 7, 1973.

David S. Dolowitz, Salt Lake City, Utah, for plaintiff.

William T. Evans, Salt Lake City, Utah, for defendants.

LEWIS, Chief Judge, and RITTER and ANDERSON, District Judges.

## OPINION

RITTER, District Judge:

Plaintiff herein sues on behalf of herself, and others similarly situated, for the purpose of obtaining an abortion. A three judge court was convened. Plaintiff is 11 to 15 weeks pregnant, dependent upon public medical assistance, and has the advice and consent of her physician to have the abortion. She seeks a declaratory judgment and injunctive relief against enforcement of a series of recently enacted Utah statutes regulating abortions, claiming invalidity, essentially as violative of her Ninth and Fourteenth Amendment rights of privacy and liberty. The challenged statutes, Section 302(3), 303, 304, 305, 306, 307, 308, 309, 310, 311, 313, 314, 315, 316,

317, 318, and 319 of Title 76, Chapter 7, Utah Code Annotated 1953, are attached as an appendix.

From conception until the end of the first trimester of pregnancy, the decision whether or not to procure an abortion, and the effectuation of that decision, rests with the pregnant woman and her physician. During this period the state has no compelling interest which overrides the woman's Ninth and Fourteenth Amendment rights of privacy and liberty and justifies regulation of the abortion decision. After this period and until the end of the second trimester of pregnancy, the state's right to regulate the abortion decision, based upon a compelling interest in the health of the pregnant woman, is limited to regulations reasonably related to maternal health, for example, regulations concerning the qualifications of the physician and the medical standard of the facilities involved. After the second trimester of pregnancy, at the stage of viability of the fetus, the state may regulate the abortion decision for the purpose of protecting the fetus, and this regulation may include prohibition of abortions except where necessary to preserve the life or health of the mother. Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); Doe v. Bolton, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973). Each of the Utah statutes contested here may apply at any stage of pregnancy: thus, they all affect plaintiff and she has standing to challenge each of them. She presents a justiciable controversy as to each of them and abstention is not warranted.

Each of these statutes imposes burdensome regulations upon the decision whether or not to have or perform an abortion at any stage of pregnancy, thus they violate the constitutional rules stated above:

Section 76-7-302(3) is too broad a regulation and invalid because it might apply in any trimester of pregnancy, and because it prohibits abortions

performed to preserve the mental health of the mother.

Section 76–7–303 is invalid because, in the first two trimesters of pregnancy, it imposes impermissibly upon the judgment of the physician whether to perform an abortion, and, in the third trimester it discriminates against poor persons and prohibits abortions to preserve the mother's *mental* health.

Section 76–7–304 is invalid because it subjects exercise of the individual right of privacy of the mother, in all abortions at all stages of pregnancy, to the consent of others.

Section 76–7–305 is invalid because it burdens the decision of a woman and her doctor, in all abortions at all stages of pregnancy, with a court proceeding and subjects the decision to judicial scrutiny.

Section 76–7–306 is invalid because it is broad enough to make an abortion impossible to obtain or to perform in any trimester of pregnancy— surely the state may not, as Utah attempts to do in Section 76–7–302, provide that every woman who desires an abortion in Utah must seek the services of a physician licensed and regulated by the state and that the majority of women who desire an abortion in Utah must seek the facilities of a state licensed and regulated hospital, and then provide, as in this section, that all such physicians and hospitals may deny their services and facilities to every such woman in every circumstance.

Sections 76–7–307 and 76–7–308 are invalid because they subject to action by third parties the right of the woman and her physician at all stages of pregnancy to decide upon and carry out an abortion.

Sections 76–7–309 and 76–7–310 are invalid because they might apply in any trimester, and because, regardless of the trimester in which they are applied, they unduly interfere with the professional judgment of the doctor involved.

Section 76–7–311 is invalid because it threatens every woman who has an abortion, at any stage of pregnancy and for any reason, with termination of parental rights without due process of law.

Section 76–7–313 is invalid because it would prevent, at all stages of pregnancy, women from seeking, and doctors from offering to perform, abortions.

Section 76–7–314 is invalid because it would limit exercise of the right to an abortion by the poor in all trimesters, for reasons having no apparent connection to health of the mother or child. The State may not so use its Medicaid program to limit abortions. Klein v. Nassau County Medical Center, 347 F.Supp. 496 (E.D.N.Y.1972), aff'd sub nom. Ryan v. Klein, 412 U.S. 924, 93 S.Ct. 2747, 37 L.Ed.2d 151 (1973); New Jersey Welfare Rights Organization v. Cahill, 411 U.S. 619, 93 S.Ct. 1700, 36 L.Ed.2d 543 (1973).

Section 76–7–315 is invalid because it subjects the abortion decision to public scrutiny by making the details of every abortion a matter of public record and thus chills exercise of the right of privacy in the abortion decision.

Sections 76–7–316, 76–7–317, and 76–7–318 fall with the invalid provisions for which they provide enforcement and penalties.

Section 76–7–319 is invalid because it attempts to make applicable to therapeutic abortions provisions which are invalid as heretofore set forth.

Defendants raise the question whether any part of these statutes is severable and may be preserved. It is clear, and the Court finds, that the overriding purpose and dominant effect of these statutes is the wholly improper one of making the obtaining or performing of an abortion in Utah extremely burdensome or impossible in every case.

Each and every challenged part of these statutes was intended to and does contribute, when each statute is read as a whole, to that improper purpose and effect. In that situation, the Court is neither obliged nor free to scrutinize the minutiae of these statutes to cull out those parts that, given a strained interpretation, might be thought to have an independent constitutionality. The Court cannot and will not edit these statutes in order to alter the legislative purpose, to do so would result in the Court exercising the legislature's constitutional power to legislate—this is a clear violation of the doctrine of separation of powers. We find all of the statutes and portions of statutes contested herein invalid *in toto*.

In view of the foregoing, it is unnecessary to determine whether this is a proper class action or what the proper class may be. Plaintiff has standing to challenge each of the contested provisions, and we find each invalid. The enforcement of each will be restrained.

### APPENDIX

Sections 301 through 320, Title 76, Chapter 7, Utah Code Annotated 1953.

76-7-301. Definitions.—As used in this part:

(1) The word "abortion" means the termination of human pregnancy with an intent other than to produce a live birth or to remove a dead fetus, and includes all procedures undertaken to kill a live fetus and includes all procedures undertaken to produce a miscarriage.

(2) The word "physician" means a medical doctor licensed to practice medicine and surgery in all branches thereof in this state, or a physician in the employment of the government of the United States who is similarly qualified.

(3) The word "hospital" means a general hospital licensed by the state department of health according to Utah Code Annotated 1953, Title 26, chapter 15, and includes a clinic or other medical facility to the extent that such clinic or other medical facility provides equipment and personnel sufficient in quantity and quality to provide the same degree of safety to the pregnant woman and the fetus as would be provided for the particular medical procedures undertaken by a general hospital licensed by the state department of health. It shall be the responsibilty of the state department of health to determine if such clinic or other medical facility so qualifies.

76-7-302. Circumstances under which abortion authorized.—An abortion may be performed in this state only under the following circumstances:

(1) If performed by a physician; and

(2) If performed ninety days or more after the commencement of the pregnancy, it is performed in a hospital; and

(3) If performed when the fetus is sufficiently developed to have any reasonable possibility of survival outside its mother's womb, the abortion is necessary to save the life of the pregnant woman or to prevent serious and permanent damage to her physical health.

76-7-303. Medical reasons required for abortion.—No abortion may be performed in this state unless, in the best clinical judgment of the pregnant woman's attending physician, there is sufficient medical reasons therefor. If the abortion is performed within the first ninety days of commencement of pregnancy, such medical reason shall be sufficient if in the attending physician's best clinical judgment the abortion is necessary to preserve the life, physical or mental health of the pregnant woman. If the abortion is performed 91 days or more after the commencement of pregnancy, such medical reason shall be sufficient if in the attending physician's best clinical judgment the abortion is necessary to preserve the life or physical health of the pregnant woman. If the abortion is performed 180 days or more after the commencement of pregnancy, such medical reason shall be sufficient if in the attending physician's best clinical judgment, as concurred in by two consulting physicians, the abortion is necessary to save the life of the pregnant

woman or to prevent serious and permanent damage to her physical health.

76-7-304. Consent requirements for abortion.—Inasmuch as various persons have an interest in and through an unborn child, before an abortion may be performed written consent to the performance of such abortion must be given by the following individuals:

(1) In all cases such consent must be given by the woman upon whom the abortion is to be performed.

(2) If the woman upon whom the abortion is to be performed is married at the time of the performance of the abortion, such consent must be given by her husband.

(3) If the woman upon whom the abortion is to be performed was married at the time of conception but was divorced between conception and the time that the abortion is to be performed, such consent must be given by her husband at the time of conception.

(4) If the pregnant woman is unmarried and under eighteen years of age, such consent must be given by the parents or guardian of such pregnant woman.

(5) In all cases, consent must be given by the father of the fetus. Where the father is unknown or cannot be located, the pregnant woman must file with the court at the time of the hearing specified in the next section an affadavit under oath so stating, and showing to the court that she has taken all reasonable efforts to identify him or locate him.

(6) In all other cases not covered by subsections (2), (3), (4), and (5) above, application must be made to the district court for consent to the performance of such abortion.

76-7-305. Hearing on abortion—Notice and procedure—Exception to requirement for hearing.—(1) Before an abortion may be performed a judicial hearing must be held after notice to the father and grandparents of the fetus, the parents or guardian of the mother of the fetus if the mother is unmarried and under 18 years of age, and the county attorney. The hearing may be before a district court or juvenile court in the county in which the pregnant woman resides, and may be advanced on any judicial calendar. If the court finds that the father of the fetus is unknown or cannot be located, and that reasonable efforts have been made to locate him or identify him, notice to him may be waived. Notice to the father of a fetus conceived out of wedlock must include a statement advising the father of his right to acknowledge the child as his own and thereby acquire parental rights.

(2) At such a hearing, findings must be made to the following:

(a) Whether all required consents were given freely while the person whose consent is required was in a state of mind to act voluntarily;

(b) Whether the pregnant woman has been advised of the availability of adoptive parents for her child;

(c) Whether she has been advised that prospective adoptive parents are willing to pay all of the expenses of the pregnant woman's maternity and the birth of her child;

(d) Whether the pregnant woman is fully informed as to the details of fetal development and the details of abortion procedures, and the possible civil liabilities that she may incur.

(3) If the court finds in the negative as to (2)(a) above, no abortion may be performed; if the court finds in the negative as to (2)(b), (c), or (d) above, no abortion may be performed until such information has been provided the pregnant woman under the direction of the court.

(4) If the procedures provided by this section are not fully complied with prior to the performance of an abortion, either parent of the unborn fetus shall have a cause of action for wrongful death against the physician performing the abortion, the right to which cause of action cannot be waived.

(5) The provisions of this section shall not apply in the case of an abor-

tion necessary to save the life of the pregnant woman or to prevent serious and permanent damage to her physical health.

76–7–306. Physician, hospital employee, or hospital not required to participate in abortion.—(1) A physician, or any other person who is a member of or associated with the staff of a hospital, or any employee of a hospital in which an abortion has been authorized, who shall state an objection to such abortion on moral or religious grounds shall not be required to participate in the medical procedures which will result in the abortion, and the refusal of any such person to participate therein shall not form the basis of any claim for damages on account of such refusal or for any disciplinary or recriminatory action against such person, nor shall any moral or religious scruples or objections to abortions be the grounds for any discrimination in hiring in this state.

(2) Nothing in this part shall require a hospital to admit any patient under the provisions hereof for the purpose of having an abortion.

(3) Nothing in this part shall require a private hospital to admit any patient under the provisions hereof for the purpose of having an abortion.

(4) Nothing in this part shall require a denominational hospital to admit any patient under the provisions hereof for the purpose of having an abortion.

76–7–307. Actions by persons having justiciable interest in child—Damages. —(1) Any person or the legal representative of any person who is entitled (or who would be entitled if the child had been born alive) to bring an action for prenatal injuries or wrongful death or who could have inherited from the child if it were born living and then died, or who otherwise would have a justiciable interest in or through the life of the child were it born living, may maintain an action for wrongful death, or the termination of rights to real or personal property, or an action for damages for the violation of any other justiciable interest, against any person who suffers or performs an abortion, which is not necessary to save the life of the pregnant woman or prevent serious and permanent damage to her physical health.

(2) A person awarded damages under section 76–7–307(1), may recover in such action three times the damages found by the court or jury to accrue to such person by reason of such abortion.

(3) If an abortion is performed in violation of this part, punitive damages and costs, including a reasonable attorney's fee, may be added to any such damages award.

76–7–308. Actions by father, grandfather or grandmother.—In addition to all causes of action specified in the foregoing section, the father, grandfather or grandmother of any aborted fetus may maintain an action against the mother of the fetus and/or against the persons performing or assisting in the performance of an abortion not necessary to save the life of the pregnant woman or prevent serious and permanent damage to her physical health, for damages, including loss of care, comfort and society.

76–7–309. Medical procedure where fetus sufficiently developed.—If an abortion is performed when the fetus is sufficiently developed to have any reasonable possibility of survival outside its mother's womb, the medical procedure used must be that procedure which in the medical judgment of the physician will give such fetus the best chance of survival, and no medical procedure designed to kill or injure such fetus may be used.

76–7–310. Medical skills to preserve life of fetus.—The physician performing any abortion must use all of his medical skills to promote, preserve and maintain the life of any fetus sufficiently developed to have any reasonable possibility of survival outside its mother's womb.

76–7–311. Child surviving abortion deemed ward of state.—Any child surviving an abortion shall become a ward of the state and the mother of such child and a father who has consented to such

abortion shall have no parental rights with regard to such child.

76–7–312. Experimentation with live fetuses prohibited.—Live fetuses may not be used for experimentation.

76–7–313. Soliciting abortions or selling and buying fetuses prohibited.—The soliciting of abortions, advertising for abortions, selling, buying, offering to sell and offering to buy fetuses are prohibited.

76–7–314. Public assistance grants or state funds not used for abortions—Abortion not a condition to receipt of assistance.—No public assistance grant, medical or otherwise, may be used for an abortion. No state funds may be used, expended or paid for abortions except where an abortion is necessary to save the life of the pregnant woman or to prevent serious and permanent damage to her physical health. The obtaining of an abortion may not be a condition to the receipt of public assistance in any form, nor shall any person intimidate or coerce any person to obtain an abortion in connection with any public assistance program.

76–7–315. Physician's report to state department of health.—In order for the state department of health to maintain necessary statistical information and in order to ensure enforcement of the provisions of this act, any physician performing an abortion must obtain and record in writing the following information: The age of the pregnant woman; her marital status and residence; the number of previous abortions performed on her; the medical reason necessitating the abortion; the hospital or other facility where performed; the weight in grams of the fetus aborted; the pathological description of the fetus; the given menstrual age of the fetus; the measurements; and the medical procedure used. Said information, together with all written consents required for the abortion and a certification by the physician that the fetus was or was not capable of survival outside of the mother's womb, must be filed by the physician with the state department of health within ten days after the abortion.

76–7–316. Injunctive relief in connection with abortion.—Any person may apply to the district court for injunctive relief to enforce any provisions of this act or to preserve any rights in connection with any abortion proposed, contemplated or threatened.

76–7–317. Violations of abortion laws—Classifications.—(1) Any person who performs or procures or supplies the means for an abortion other than authorized by this chapter is guilty of a felony of the second degree.

(a) A violation of sections 76–7–319 [76–7–309], 76–7–310, 76–7–311, 76–7–312, 76–7–313, or 76–7–314 of this part is a felony of the third degree.

76–7–318. Violation by physician as basis for disciplinary action.—In addition to any other penalties, a violation of any section of this part by a physician may be the basis for disciplinary action against the physician for unprofessional conduct under the provisions of Utah Code Annotated 1953, section 58–12–35.

76–7–319. Laws applicable to abortion to save life or prevent damage to physical health of woman.—In the event of an abortion performed to save the life of the pregnant woman, or to prevent serious and permanent damage to her physical health, no provision of this act shall apply except sections 76–7–301, 76–7–302, 76–7–304–1 through (5), 76–7–306, 76–7–310, 76–7–315 and 76–7–320.

76–7–320. Separability clause.—If any one or more provisions, section, subsection, sentence, clause, phrase or word of this part or the application thereof to any person or circumstance is found to be unconstitutional, the same is hereby declared to be severable and the balance of this part shall remain effective notwithstanding such unconstitutionality. The legislature hereby declares that it would have passed this part, and each provision, section, subsection, sentence, clause, phrase or word thereof, irrespective of the fact that any one or more provision, section, subsec-

tion, sentence, clause, phrase or word be declared unconstitutional.

LEWIS, Circuit Judge:

My study of the Utah Abortion Act and the posture in which this case is presented to the court leaves me with several areas of concern. The legislature has obviously attempted to limit the performance of abortions in Utah to the absolute minimum that is constitutionally allowable. This expression of intent is, considered generally, a legislative prerogative for that body is charged with the duty of expressing and determining what is best for the public welfare. However, the court is in complete agreement that numerous provisions in the Act are impermissibly restrictive and patent violations of the United States Constitution. And I agree that the overall Act is such as to make the obtaining or performing an abortion in Utah extremely difficult or impossible in every case.

It also seems glaringly apparent to me that the legislature was well aware and well advised that many of the provisions of the Act could not and would not pass judicial constitutional scrutiny. The Act is in direct conflict in many regards to the dictates of *Roe* and *Doe* and the legislature has simply rejected the mandate of those decisions with a not too subtle qualification contained in § 76–7–320 which provides:

> Separability, clause.—If any one or more provision, section, subsection, sentence, clause, phrase or word of this part or the application thereof to any person or circumstance is found to be unconstitutional, the same is hereby declared to be severable and the balance of this part shall remain effective notwithstanding such unconstitutionality. The legislature hereby declares that it would have passed this part, and each provision, section, subsection, sentence, clause, phrase or word thereof, irrespective of the fact that any one or more provision, section, subsection, sentence, clause,

phrase or word be declared unconstitutional.

The background would seem to amount to an open and untraditional invitation for the court to examine the Act word by word, to edit the Act, and to save as much as possible of its substance so as to preserve a highly restrictive Act. Perhaps this aspect of the case climaxes in § 76–7–306 wherein the court is requested to select from a multiple choice group of answers. Section 306(2) states that *any* hospital may refuse any patient admittance for the purpose of having an abortion; section 306(3) provides that a *private* hospital may so refuse; section 306(4) provides that a *denominational* hospital may so refuse. I think it generally improper, under the guise of a severability provision, for a court to accept such a responsibility and certainly would not do so subjectively, absent most compelling circumstances and even then with considerable reluctance.

Judge Ritter has indicated that he rejects *in toto* what I have termed the legislative invitation and holds that each of the provisions of the Act that is challenged is unconstitutional. He thus would invalidate the entire Act, excepting those sections not challenged.

Judge Anderson has fully accepted the legislative invitation and has expressed his extensive views as to each substantive section. He concludes however that sections 303, 304, 305, 307, 308, 309, 311, 314 and 316 are unconstitutional. Many of the remaining challenged sections he would sever and preserve as operational or qualifiedly so. To me, such drastic severance amounts to a judicial rewriting of the Act and I am not prepared to say that the result would reflect the actual intent of the legislature. A single example, although there are more, can be used to show my concern that a hodgepodge Act should not be declared the law of this state. Section 310, when viewed in isolation, would appear to make it a felony for a physician, faced with the ultimate decision of which life to save—that of a viable baby or the mother—to preserve the life of the

mother. Judge Anderson states that this section is ambiguous and can be interpreted differently because of the interplay of interrelated sections. But extensive severance destroys that interplay and I simply want no part in preserving any such statute absent consideration of a clear and unequivocal legislative expression of intent projected against a basically constitutional Act.

In my initial consideration of this case I expressed the view to my colleagues that I was willing, reluctantly, to agree to some judicial severance within the Act to what I then considered the compelling need to preserve a basic Act relating to the right of the state during the third trimester. I was of the opinion, and am now, that such a basic Act, clearly constitutional and standing alone, could be accomplished by severing the word "physical" in section 302(3) and preserving only the last sentence of section 303 with the phrase "as concurred in by two consulting physicians" and again the word "physical" eliminated. Adjustment of the penalty provision in section 317 could be accordingly preserved. I am now informed that the Utah legislature will meet in special session in October 1973 and the compelling need that I subjectively felt has been alleviated. If such compelling need is existent it can be considered by the proper branch of government.

Accordingly, and for the reasons stated by my brothers, I agree that sections 303, 304, 305, 307, 308, 311, 314 and 316 are unconstitutional and totally invalid. I agree with Judge Ritter regarding the remaining sections of the Act to the extent that such sections should not remain operative and consequently join in the result that the entire Act, as challenged, should be declared inoperative and its enforcement restrained. In reaching this conclusion I in no way negative the right of the legislature to consider the subject matter of the unenumerated sections of the Act. Most, and perhaps all, of these matters may be very properly the subject of legislative control. But they should be considered in view of a basically constitutional approach to the subject matter and should not be delegated to the judiciary directly or indirectly. The sensitivity of the subject of abortion is no less difficult for judges than it is for legislators.

ALDON J. ANDERSON, District Judge (concurring in part and dissenting in part):

I join with the majority in invalidating as unconstitutional certain sections of the Act, designated herein. Other provisions, however, clearly appear to be constitutional and not affected by a damaging interrelationship with a tainted section. As to these I respectfully dissent from the majority's action believing that established principles governing severability and judicial scrutiny of legislative intent require a contrary ruling. These principles are explained in Dorchy v. Kansas, 264 U.S. 286 when at pp. 289–290, 44 S.Ct. 323, 324, 68 L. Ed. 686 (1924) the Court stated:

> A statute bad in part is not necessarily void in its entirety. Provisions within the legislative power may stand if separable from the bad. . . . But a provision, inherently unobjectionable, cannot be deemed separable unless it appears both that, standing alone, legal effect can be given to it and that the legislature intended the provision to stand, in case others included in the act and held bad should fall.

The Act in question complies with these requisites. Certain of its provisions are constitutional and severable. It clearly appears from section 320 that the Legislature intended the valid provisions to stand, and that they could stand without doing violence to their manifest intent. If certain provisions are constitutional, but there is concern regarding whether applicable state law permits severing the sections, the proper result would seem to be to allow the state court to decide the issue. Morey v. Doud, 354 U.S. 457, 470 n. 16, 77 S.Ct. 1344, 1 L. Ed.2d 1485 (1957). There the Court

noted that severability is a question of state law.

It would seem that examination of legislative motives should not properly result in the invalidation of the whole Act. "But a judiciary must judge by results, not by the varied factors which have determined legislators' votes. We cannot undertake a search for motive in testing constitutionality." Daniel v. Family Security, 336 U.S. 220, 224, 69 S.Ct. 550, 552, 93 L.Ed. 632 (1948). Justice Harlan in his dissent in Baker v. Carr, 369 U.S. 186, 337, 82 S.Ct. 691, 775, 7 L.Ed.2d 663 (1962) stated:

> Since Fletcher v. Peck, 6 Cranch. 87, was decided many years ago, it has repeatedly been pointed out that it is not the business of the federal courts to inquire into the personal motives of the legislators.

I concur with the majority in striking the following sections: part of 303, and all of 304, 305, 307, 308, 309, 311, 314, and 316. For reasons now to be given I dissent from invalidating 302(3), part of 303, and all of 306, 310, 312, 313 and I will comment on other provisions of the Act.

*Section 302(3)*

Section 302(3) provides that abortions are permissible "[i]f performed when the fetus is sufficiently developed to have any reasonable possibility of survival outside its mother's womb, the abortion is necessary to save the life of the pregnant woman or to prevent serious and permanent damage to her physical health." I agree with Chief Judge Lewis that 302(3) may be rendered constitutional and serve as the basis of an act by severing the word "physical." This section is challenged as an unconstitutional limitation on the woman's relatively unencumbered right to terminate a pregnancy during approximately the first and second trimesters of pregnancy. It is also challenged as being overbroad in the sense that it limits the factors to which the physician may look in determining the medical advisability of an abortion during the period of viability to the *physical* health of the pregnant woman, rather than permitting an evaluation of other health factors as well.

The first of these objections is easily met. The requirements of section 302(3) apply only if the abortion "is performed when the fetus is sufficiently developed to have any reasonable possibility of survival outside its mother's womb." This language is essentially synonymous with the Court's definition of viability. Roe v. Wade, *supra*, 410 U.S. at 160, 93 S.Ct. at 730. That definition is: ". . . potentially able to live outside the mother's womb, albeit with artificial aid." By its own terms, therefore, 302(3) applies only to the portion of the gestation period following the point in time at which the fetus becomes viable, or during approximately the third trimester. It is not, therefore, unconstitutional as an impermissible regulation of the woman's right to terminate her pregnancy during approximately the first or second trimesters.

The second objection to 302(3) is more troublesome. The considerations governing abortions during the period of viability are described in the words of the Court as follows:

> For the stage subsequent to viability, the State in promoting its interest in the potentiality of human life may, if it chooses, regulate, and even proscribe, abortion éxcept where it is necessary, in appropriate medical judgment, for the preservation of the life or *health* of the mother.[1] (Emphasis added.)

The Court's starting point is its own prior interpretation of the word "health" in United States v. Vuitch, 402 U.S. 62, 91 S.Ct. 1294, 28 L.Ed.2d 601 (1971). There the Court interpreted "health" to mean both a patient's mental and physical state; that is, psychological as well as physical well-being.[2] The

---

1. Roe v. Wade, 410 U.S. 113, 164–165, 93 S. Ct. 705, 732, 35 L.Ed.2d 147 (1973).

2. The District of Columbia statute under review in Vuitch, and likewise the Supreme

Court held that when viewed in this light the term "health," as contained in the District of Columbia statute, presented no problem of vagueness, *Vuitch, supra* at 71–72, 91 S.Ct. 1294. In Doe v. Bolton, *supra,* 410 U.S. at 192, 93 S.Ct. at 747, this interpretation was broadened to include other factors.

We agree with the District Court . . . that the medical judgment may be exercised in the light of all factors—physical, emotional, psychological, familial, and the woman's age —relevant to the well-being of the patient. All these factors may relate to health. This allows the attending physician the room he needs to make his best medical judgment. And it is room that operates for the benefit, not the disadvantage, of the pregnant woman.[3]

It thus becomes clear that the physician, in arriving at a medical or clinical judgment regarding the advisability of an abortion before viability, is free to inquire with his patient into all relevant matters, mental, emotional, and physical embodied in the concept of health. Such a rule allows the physician during this period, in deference to his professional abilities, to exercise independent judgment and to determine whether or not she should terminate her pregnancy. The court is consistent in using the same terms, in reference to health throughout the entire period of pregnancy. Thus, the term "health," as applied by the Court to the period after viability, approximately the third trimester, should be defined in the same manner as it is for the period before viability.

Therefore, because the adjective "physical" limits the factors relevant to the physician's determination of the woman's health, it should be omitted. The remaining restrictions imposed by section 302(3) are valid. They are sev-

erable and should be given effect. Such a provision, restricting abortion after viability to situations where it is necessary to preserve the pregnant woman's life or prevent serious and permanent damage to her health, would be constitutional.

The Court specifically repudiates the assertion that there should be abortions upon demand. In Roe v. Wade, *supra* at 410 U.S. 153, 93 S.Ct. at 727 it stated that:

. . . [A]ppellants and some *amici* argue that the woman's right is absolute and that she is entitled to terminate her pregnancy at whatever time, and in whatever way, and for whatever reason she alone chooses. With this we do not agree.

The Court's opinions in *Roe* and *Doe* placed great faith in the integrity of the physician. Up until the point of viability he has discretion in the context of his medical and clinical judgment to prescribe abortions. However, the state, by virtue of its compelling interest in the woman's health, may enact health regulations to protect the woman during the second trimester.

After viability, however, the state's interest in protecting the fetus becomes compelling and at this point the state may prohibit abortions except where necessary to preserve the life or health of the woman. *Roe, supra,* 410 U.S. at 165, 93 S.Ct. 705.

In analyzing the approaches taken by the other courts in recent abortion cases, the Supreme Court summarized as follows in *Roe, supra* at 165–166, 93 S.Ct. at 733:

*The decision leaves the State free to place increasing restrictions on abortion as the period of pregnancy lengthens,* so long as those restrictions are tailored to the recognized state in-

---

Court's interpretation of the word "health" contained in that statute, apparently applied to the entire gestation period.

**3.** Conditioning the existence of a protected right upon the amount of medical knowledge

available at the time of the decision seems to be highly anomalous. *See* Ely, The Wages of Crying Wolf: A Comment on Roe v. Wade, 82 Yale L.J. 920, 942 n. 117 (1973).

terests. The decision vindicates the right of the physician to administer *medical treatment according to his professional judgment up to the points where state interests provide compelling justifications for intervention.* (Emphasis added.)

Thus, as the period of the pregnancy lengthens the state may act to protect its compelling interests. As these compelling interests materialize, a greater showing of necessity is required in the light of all factors bearing on the patient's health, before allowing an abortion to be performed.

The physician, in the exercise of his best clinical judgment, must balance the factors weighing in favor of an abortion with those factors weighing against an abortion. He must weigh the threat to the woman's life or the threat of serious and permanent damage to her health because of childbirth against 1) the greater physical risk to the woman caused by an abortion at the later stages of pregnancy [4] and the possible psychological and emotional harm to the woman as a result of the abortion—the compelling state interest in protecting the woman's health—and 2) the compelling state interest in protecting the life of the fetus. Thus the woman's need for an abortion would have to be balanced against and outweigh two compelling state interests: the interest in protecting the woman's health and the interest in protecting the life of the fetus.

The burden of decision on the doctor is thus substantially greater at this juncture and under the restrictions of this section would serve to "proscribe" the performance of abortions after viability as the Legislature apparently intended.

The statute properly requires the physician to determine whether childbirth would pose a threat of *serious and permanent* damage to the woman's health. Temporary conditions or factors of slight magnitude when compared with the other interests involved will obviously not suffice. Thus, for example, speculation that the birth of the child will bring upon the woman "a distressful life," or create "inconveniences," would not be extensive or durable enough to justify the extinguishing of potential life.

### Section 303

To accompany 302(3) the last part of 303 should be severed and saved, as follows:

". . . If the abortion is performed 180 days or more after the commencement of pregnancy, such medical reason shall be sufficient if in the attending physician's best clinical judgment the abortion is necessary to save the life of the pregnant woman or to prevent serious and permanent damage to her health."

Stricken from this part of 303 is the requirement that the physician obtain the concurring approval of two other physicians for any abortion performed after viability. The similarity between this requirement and the one struck down by the court in Doe v. Bolton, *supra* requires, for the reasons given by the Court in *Doe,* the conclusion that this provision is invalid. The deletion of "physical" here would make 303 correspond with 302(3) as changed above and for the reasons stated there. Retaining "180 days" would prevent uncertainty concerning when these provisions take effect.

### Section 304

Neither *Roe* nor *Doe* considered whether, "in the constitutional context" the father has any rights concerning the abortion decision. Roe v. Wade, *supra,* 410 U.S. 165 n. 67, 93 S.Ct. 705. Apparently the Utah Legislature enacted section 304 in an attempt to assert that others, besides the pregnant woman, have rights affected when an abortion

---

4. Roe, supra at 150.

occurs. This section not only requires the consent of the father, if he can be located, but also that of the woman upon whom the abortion is to be performed and, if the woman is unmarried and under 18 years of age, the parents or guardian of such woman.

Because section 304 cannot stand by itself, but is inextricably tied to section 305 which this court has determined to be invalid, section 304 must also fall. By invalidating 304 the merits of the consent requirements are not reached. The necessity of the woman's consent is obvious, but the remaining problems of consent raised by various provisions of section 304 are not easily resolved.

Parents and fathers, especially husbands, have well recognized interests in the family unit. In the distressful circumstances often associated with the abortion decision, family advice and counseling, a skill in which many physicians are not trained, may be more important than the purely medical diagnosis. Particularly where the patient is a pregnant, unwed minor child the proposition that the child's parents should have to be consulted in deciding whether an abortion is necessary finds a great deal of support in the general law applicable to the relationship between the minor, her parents, and society. A further question is whether a father, particularly a husband, has rights entitled to consideration.[5] However, under present circumstances the right of the woman is one that the Court has deemed to be fundamental, and lesser interests or rights themselves deemed fundamental in another context may not be allowed to interfere or impose an undue burden upon the woman's right of privacy.

*Section 305*

In section 305 the Legislature has apparently endeavored to give the consent provision discussed above the fullest effect possible. It has required a judicial hearing before any abortion is performed, except under the circumstances described in section 319. At the hearing the county attorney must be present, determination must be made by a state judge as to whether the consensual agreements were voluntary, and whether both the father and mother have been fully informed of certain matters bearing upon the quality of their respective personal decisions to procure or consent to an abortion. The mother must also be advised of possible civil liabilities which might be incurred.

The Court's opinions in the abortion cases render unavoidable the conclusion that the regulation imposed upon the abortion decision by the terms of 305 constitutes a substantial state interference of a nature which the Court considered impermissible. By Court standards the requirements of this section would effectively inhibit the woman's exercise of her right of privacy to an unacceptable degree. Ensuring the efficacy and voluntariness of the consent may be legitimate and proper, but these provisions go beyond that which might reasonably be required for this purpose. Therefore, section 305 is invalid as measured by the standards of *Roe* and *Doe*.

Striking down section 305 does not mean that some of the apparent purposes of this section are not salutary. For example, the effort made to inform the woman of the availability of adoptive parents, and their willingness to pay the expenses involved in the adoption proceedings, are particularly commendable. Such provisions serve to aid the woman in making an informed exercise of her rights, and if such information were presented in a manner that does not burden the exercise of the right, it would seem to be permissible.

5. Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) ; *cf.*, Skinner v. Oklahoma, 316 U.S. 535, 541, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942). It is possible that other parties in addition to the pregnant woman and the state have an interest in the abortion decision. The recognizing of such rights in the father and the parents of an unwed minor would require that their interests be considered.

*Section 306*

Section 76–7–306 is similar to section 26–1202(e) of the Georgia Criminal Code which was examined by the Court in Doe v. Bolton, *supra.* In *Doe* the Court upheld a provision essentially identical with 306(2) of the Utah statute stating that "[n]othing . . . shall require a hospital to admit any patient under the provisions hereof for the purposes of performing an abortion. . . ." The Court also upheld the right of individuals to refuse to participate in the abortion procedure "for moral or religious reasons." 410 U.S. 197–198, 93 S.Ct. 739.

The Legislature's action in enacting a provision granting "a hospital" the right to refuse to perform abortions and then enacting seemingly repetitive additional subsections granting "private and denominational hospitals" similar rights is somewhat unusual. Ostensibly the term "a hospital" includes private and denominational as well as public institutions. The Court's consideration of this problem in *Doe* was somewhat abbreviated and incomplete. Perhaps the drafting of this section was an effort by the Legislature to provide for the possibility that the holding of *Doe* on this point may at some time in the future be restricted, but whatever the reason, the legislative motive is irrelevant.

306(1) and 306(4) do nothing more than protect the conscience of the individual and the prerogative of the denominational hospitals. In accordance with the explicit discussion of the Court in *Doe,* these subsections are constitutional.

As to subsections 306(2) and (3), there are not enough facts before the court. These provisions do not deny plaintiff her constitutional right simply because hospitals are free to prohibit or permit abortions. If a less speculative fact situation indicates that public hospital policies are unduly hampering the exercise of this protected right, appropriate relief could then be granted.

Hathaway v. Worcester City Hospital, 475 F.2d 701 (1 Cir. 1973).

The plaintiff contends that hospitals identified with the state to the extent that their activities constitute state action should not be permitted to refuse admittance to abortion patients. Such a determination might unduly interfere with state hospital policies much more than is necessary in order to adequately protect plaintiff's rights. Research centers, hospitals providing only specialized treatment, and hospitals without facilities to perform the required procedures would be obliged, if relief were granted on the basis of a finding of state action alone, to accept abortion patients. Therefore, a determination of the latitude hospitals can have in this area should await a more specific fact situation where the burden on the protected right and the justification for the policy decision are more clearly presented.

*Section 310*

This section requires the physician to use all of his medical skills to save the life of "any fetus sufficiently developed to have any reasonable possibility of survival outside its mother's womb." The quoted language fairly limits the application of this section to abortion operations performed after the fetus has become viable. Therefore, abortion to which 310 applies is one instituted in the first instance to save the life of the mother or to prevent serious and permanent damage to her health. Utah Code Ann. §§ 76–7–302(3) and 319 (Supp. 1973). It is illogical to expect that in carrying out an abortion for the purpose of saving the mother's life the physician should be required to engage in a procedure which would endanger her life. Such could not have been the intent of the Legislature. Section 310 is valid because the reasonable construction requires only that the physician use his best skills to promote the life of the fetus in the context of saving the mother's life, which is his first and primary con-

cern. However, if the physician is faced with alternative methods of performing the abortion, his selection of methods should be based on his consideration for the woman's health. If the alternatives do not endanger the woman's health, and one method is safer for the fetus than the other methods, the safer method should be employed regardless of expense, time or effort on the part of the physician performing the abortion.

*Section 312*

This section, concerning experimentation with live fetuses, has not been challenged. It is not interrelated with any tainted section and should stand.

*Section 313*

Although perhaps not carefully drafted, the soliciting and advertising prohibitions of section 313 were designed to prevent doctors or others from unethical importuning and from unduly commercializing this aspect of medical practice. Despite the action of the majority in striking down this section, physicians remain barred from such practices by Utah Code Ann. § 58–12–36 (Supp.1973) and the code of ethics of their profession. The activities of others, by virtue of this decision, are not now subject to regulation, although the state has authority to do so in the commercial context. Pittsburg Press Co. v. Pittsburgh Commission on Human Relations, 413 U.S. 376, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973). The above provision, along with the remaining aspects of section 313 prohibiting the buying and selling of fetuses as well as offer of the same, did not impinge upon the plaintiff's rights and should have been found constitutional.

*Other Sections*

If by the action of the court a constitutional act were being preserved, then consideration might also be given to the significant aspects of other sections. Under the present circumstances comment on these sections does not seem necessary.