**Mary ROE, on behalf of herself and all other persons similarly situated, Plaintiff,**

**v.**

**Honorable Calvin L. RAMPTON, individually and in his capacity as Governor of the State of Utah, Honorable Vernon B. Romney, individually and in his capacity as Attorney General of the State of Utah, Defendants.**

**No. C 74–344.**

United States District Court,
D. Utah,
Central Division.

Jan. 17, 1975.

Dissenting Opinion March 18, 1975.

Lewis, Chief Judge, concurred in the result and filed an opinion.

Ritter, Chief District Judge, dissented and filed an opinion.

David S. Dolowitz, Salt Lake City, Utah, for plaintiff.

William T. Evans, Salt Lake City, Utah, for defendants.

Before LEWIS, Chief Judge, RITTER, Chief District Judge, and ANDERSON, District Judge.

**678**

### ORDER DENYING INJUNCTIVE RELIEF AND ORDER OF ABSTENTION AND DISMISSAL WITH ACCOMPANYING OPINIONS

For the reasons set forth in the separate opinions which follow, this court, on November 22, 1974, denied temporary injunctive relief and now enters its order abstaining and dismissing the above-entitled action to allow the state courts to decide the questions, including the determination of a class action, presented by this case.

It is therefore ordered that this case be and it is herewith dismissed.

ALDON J. ANDERSON, District Judge.

On November 4, 1974, plaintiff in the above-entitled matter filed a class action for injunctive and declaratory relief seeking a ruling that Utah Code Ann. § 76–7–304(2) (1974) contravenes the Fifth and Fourteenth Amendments to the United States Constitution in that it is overbroad in its regulation of abortions in the State of Utah, constitutes an invasion of her privacy, invalidly regulates her relationship with her physician, and, if complied with, would force her to incriminate herself under provisions of the Utah adultery or fornication statutes.

On November 7, 1974, plaintiff filed a motion for a temporary restraining order with an accompanying memorandum. On November 8, 1974, the trial court signed an order to show cause for temporary restraining order. On November 12, 1974, at 9 a. m., oral arguments were heard and the trial court denied the motion for a temporary restraining order. At 3:30 p. m., on November 12, 1974, the trial court heard plaintiff's motion for a reconsideration of the court's earlier ruling denying the temporary restraining order. After evidence and testimony were received and oral argument was heard, the trial court reserved the question of injunctive relief for determination by the three-judge court.

The parties stipulated to the facts in the case and agreed that the matter be finally submitted, together with the request for temporary injunctive relief, to the three-judge court on November 21, 1974. The three-judge court composed of Honorable David T. Lewis, Chief Judge of the United States Court of Appeals for the Tenth Circuit, Honorable Willis W. Ritter, Chief Judge of the United States District Court for the District of Utah, and Honorable Aldon J. Anderson, Associate Judge of the United States District Court for the District of Utah, was duly convened on November 21, 1974, and the matter was presented. On November 22, 1974, pursuant to an order agreed upon by Chief Judge Lewis and Judge Anderson, with Chief Judge Ritter dissenting, a minute entry was entered denying preliminary injunctive relief, reserving for subsequent determination the other issues raised by the pleadings.

### FACTS

Plaintiff Mary Roe is seventeen years of age. At the time this action was filed and at the time of the hearing she was in her first trimester of pregnancy. Preliminary injunctive relief was denied on the last day of her first trimester and she has now passed into the second trimester. She desires to have an abortion but has been advised by her physician that under the provisions of Utah Code Ann. § 76–7–304(2) (1974) he is obligated to notify her husband prior to performing an abortion upon her. Plaintiff is married but separated and estranged from her husband and a divorce is pending. Since the date of their initial separation plaintiff states she has had no sexual relationship of any kind with her husband. She claims the child she is bearing is not the child of her estranged husband. Plaintiff is unwilling to allow the doctor to inform her estranged husband of the abortion she seeks, and without complying with the notice provision of the Utah statute the physician is unwilling to perform

the abortion. I agreed with Chief Judge Lewis that preliminary injunctive relief should be denied. My reasons are set forth herein. I also find that these facts make this an appropriate case for the federal court to abstain and allow the state courts an opportunity to construe or limit the scope of the statute under question.

## PRELIMINARY INJUNCTION

Under the circumstances of this case, plaintiff had the burden to make a prima facie case showing (1) a reasonable likelihood of prevailing on the merits, that is, a reasonable probability that she would ultimately be entitled to the relief sought, and (2) irreparable injury if the specific injunctive relief sought was not granted. Crowther v. Seaborg, 415 F.2d 437, 439 (10th Cir. 1969).

## IRREPARABLE INJURY

The prime requisite for temporary injunctive relief is a showing by the applicant that irreparable injury of a substantial nature is threatened by the conduct against which the restraint is sought. *See* Capital City Gas Co. v. Phillips Petroleum Co., 373 F.2d 128, 131 (2nd Cir. 1967); 7 Moore, Federal Practice ¶ 65.04 (2d ed. 1974). Plaintiff argues that irreparable injury is found in the instant case by the increasing physical risks inherent in having an abortion in the second trimester of pregnancy as compared to the physical risks in the first trimester, or in not being able to secure an abortion at all. The facts, however, show that this is not the measure of irreparable injury in this case. Plaintiff is not deprived from obtaining the abortion she seeks, in either the first or second trimester of pregnancy, except by her own decision. She wants a secret abortion and has directed the physician not to notify her husband of her desire. Her physician is willing to perform the abortion, but will not do so without giving her husband notice in conformity with the provisions of the Utah statute herein cited. Irreparable injury, therefore, is measured, not by any increased physical risks or even the likelihood of not being able to have an abortion, but by the injury to plaintiff of having her husband know of the abortion. Under these circumstances notification to a husband of a desired abortion does not justify a conclusion of irreparable injury.

The dissent's statement: "I see nothing in Roe v. Wade or Doe v. Bolton that permits the woman's right to an abortion in the first trimester to be conditioned upon a showing of 'irreparable injury'" is an inaccurate characterization of the denial of preliminary injunctive relief and this discussion of irreparable injury. While it is correct that irreparable injury is not a condition precedent to obtaining an abortion in the first trimester of pregnancy, it is also a fact that the Supreme Court decisions, referred to by the dissent, do not provide a woman with an unconditional right to a "secret" abortion during any trimester of pregnancy. Irreparable injury, therefore, is discussed only to help determine whether or not preliminary injunctive relief should issue pending a determination of whether plaintiff is entitled to a "secret" abortion.

The only other matter discussed by the dissent which bears upon irreparable injury is the observation that the provision of the Utah abortion statute in question requires the plaintiff, under the circumstances of this case, to incriminate herself. This argument suggests that plaintiff could be subject to prosecution under the Utah statutes making adultery or fornication misdemeanors if she requested an abortion from her physician, her physician notified her husband, and her husband could convince a prosecutor to file an adultery suit. This case should not be decided by such a remote, hypothetical causal chain. The dissent has overlooked Rule 27 of the Utah Rules of Evidence, adopted by the Supreme Court of Utah effective July 1, 1971, which provides a physician-patient privilege in prosecutions

of misdemeanors. The infrequent prosecution under the adultery and fornication statutes, the fact that a physician's testimony concerning plaintiff's pregnancy in such a trial would be privileged under Rule 27 of the Utah Rules of Evidence, the privilege against self incrimination which would protect plaintiff from testifying against herself, and the unknown identity of the plaintiff's unlawful impregnator eliminate any reasonable likelihood of prosecution for adultery.

## SUBSTANTIAL LIKELIHOOD OF PREVAILING ON THE MERITS

The Supreme Court in Roe v. Wade, 410 U.S. 113, 154–55, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) held that a right to an abortion is fundamental and can therefore be regulated only on the basis of a compelling state interest. In this regard, the Court found that a state has two important and legitimate interests: (1) in protecting maternal health and (2) in protecting the life or potential life of the fetus. However, neither of these interests can be "compelling" throughout the entire pregnancy. During the first trimester of pregnancy, the Supreme Court has held that neither interest is sufficiently compelling to justify an interference with an abortion decision of the woman and her physician. During the second trimester, the interest in maternal health increases and the state may regulate the abortion procedure to the extent that the regulation reasonably relates to the preservation and protection of maternal health. During the third trimester, the fetus becomes viable and the interest in protecting it increases, which allows the state to reasonably regulate abortion, taking into account both interests.

In the first trimester of pregnancy "the attending physician, in consultation with his patient, is free to determine, without regulation by the State, that, in his medical judgment, the patient's pregnancy should be terminated." Roe v. Wade, *supra* at 163, 93 S.Ct. at 732.

The Supreme Court's observations on "medical judgment" from Doe v. Bolton, 410 U.S. 179, 192, 93 S.Ct. 739, 747, 35 L.Ed.2d 201 (1973) are also relevant:

We agree with the District Court, 319 F.Supp. [1048] at 1058, that the medical judgment may be exercised in the light of all factors—physical, emotional, psychological, familial, and the woman's age—relevant to the well-being of the patient. All these factors may relate to health. This allows the attending physician the room he needs to make his best medical judgment. And it is room that operates for the benefit, not the disadvantage, of the pregnant woman.

With this constitutional backdrop, the statute in question, Utah Code Ann. § 76–7–304 (1974), provides:

Considerations by physician—Notice to minor's parents or guardian or married woman's husband.—To enable the physician to exercise his best medical judgment, he shall:

(1) Consider all factors relevant to the well-being of the woman upon whom the abortion is to be performed including, but not limited to,

(a) Her physical, emotional and psychological health and safety,

(b) Her age,

(c) Her familial situation.

(2) Notify, if possible, the parents or guardian of the woman upon whom the abortion is to be performed, if she is a minor or the husband of the woman, if she is married.

Weighing the constitutional considerations provided by the Supreme Court decisions cited above against the Utah statute in question, I am unable to conclude that there is a substantial likelihood that plaintiff will prevail on the merits of this suit. This conclusion is based upon an appraisal of the merits of the case and several theories that would allow a construction of the questioned statute in a manner that would avoid a constitutional confrontation.

First, the challenged subsection 2 of the Utah statute which provides for notice to be given, if possible, to the husband of a woman securing an abortion might be sustained as a valid provision intended to provide the physician with relevant information concerning the woman's physical, emotional, psychological or familial situation in order for him to exercise his best medical judgment. The statute, admittedly, is awkwardly drafted as a provision to supply relevant medical data to the physician since it does not require the doctor to receive or even seek any information apart from merely notifying the husband of the abortion decision. It was acknowledged at the hearing by plaintiff's counsel that "in all probability" a consultation with the husband would have some medical significance in determining the psychological profile of the woman. (Transcript at 21.) I am unable to say that this provision does not contemplate that in the notification process that some relevant information, albeit minimal, would be exchanged. Even if no relevant information were exchanged in the notification process, the mere observation by the doctor of the reaction of the husband or parents to the abortion decision would provide insight into the psychological or familial setting into which the woman would return following the abortion. The requirement "to notify, if possible" is minimal. No spousal or parental consent is required. The abortion decision is left to the woman and her physician, as is constitutionally required. A reasonable construction of the provision would allow it to be sustained as providing at least some relevant insight into the woman's present or future health.

Second, the notification provision of the Utah statute could be justified since a husband or parents have a recognized interest in the abortion decision being contemplated. The nature of the husband's interest has been recognized and explained by commentators and courts alike.

In Brodie, Marital Procreation, 37 Oregon L.Rev. 245, 246 (1972) it states:

One of the rights of marriage is the right to procreate. In Meyer v. Nebraska, the Supreme Court spoke of the due process "right of the individual . . . to marry, establish a home and bring up children. . ." In Skinner v. Oklahoma, the Court stated that "[m]arriage and procreation are fundamental to the very existence and survival of the race," and proceeded to use and equal-protection argument as the basis for striking down legislation authorizing the sterilization of certain criminals. An equally positive description is found in the approval of a legislative divorce in the 1888 case of Maynard v. Hill where marriage was called "the foundation of the family and of society, without which there would be neither civilization nor progress."

The case of Doe v. Doe, Mass., 314 N. E.2d 128 (1974) decided by the Supreme Court of Massachusetts states:

We are deeply conscious of the husband's interest in the abortion decision, at least while the parties are living together in harmony. Surely that interest is legitimate. Surely, if the family life is to prosper, he should participate with his wife in the decision. But it does not follow that he must have an absolute veto, or that his veto, reasoned or unreasoned, can be enforced by the Commonwealth.

The United States District Court for the Southern District of Florida in the case of Coe v. Gerstein, 376 F.Supp. 695, decided April 17, 1974, sitting as a three-judge court, observed:

We recognize that the interest of the husband in the embryo or fetus carried by his wife, especially if he is the father, is qualitatively different from the interest which the mother may have in her health and the interest of the viable fetus in its potential life. The interest which a husband has in seeing his procreation carried

full term is, perhaps, at least equal to that of the mother. The biological bifurcation of the sexes, which dictates that the female alone carry the procreation of the two sexes, should not necessarily foreclose the active participation of the male in decisions relating to whether their mutual procreation should be aborted or allowed to prosper. It may be that the husband's interest in this mutual procreation attaches at the moment of conception.

The Supreme Court expressly recognized in footnote 67 in Roe v. Wade, *supra,* that an interest in the father was not ruled out by its decision:

Neither in this opinion nor in Doe v. Bolton, 410 U.S. 179 [93 S.Ct. 739, 35 L.Ed.2d 201], do we discuss the father's rights, if any exist in the constitutional context, in the abortion decision.

The nature of the interest in the family of a minor is also well established and stated concisely by the Court in Prince v. Massachusetts, 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1943):

It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.

■ An abortion operation is different and easily distinguished from other operations in which an absolute right to the control of one's body might he argued. A husband is a partner to his wife's pregnancy and has an interest in the future posterity and fruits of the marriage relationship. The marriage contract contemplates the making of a home and the raising of a family—basic goals of tremendous importance to society. The Supreme Court has not yet considered whether or not a husband's consent may be required before an abortion may be performed on his wife. This question is also not before this court. The Utah statute in question would merely provide the husband with notification of the abortion decision. I believe that the husband should have the right to be advised concerning any significant action affecting the family life. Even though not presently given a right to determine with his wife whether an abortion should be had, the husband being apprised of a contemplated abortion should have an opportunity to consult with her. It is socially and constitutionally naive to consider the abortion decision as solely a woman's concern.

That the Utah Legislature recognized an interest in the husband or parents of a minor in the area of abortion is evidenced in several ways. First, the Legislature included the abortion statute in part 3 of Chapter 7 of the Utah Criminal Code entitled, "Offenses Against the Family." A family contemplates a husband if the woman is married, or parents if the woman is an unmarried minor. Second, § 76–7–304's predecessor (§ 76–7–304 in the 1973 Utah Abortion Statute) showed a strong concern for such an interest in these words: "Inasmuch as various persons have an interest in through an unborn child . . . .." The new § 76–7–304 bearing the title, "Considerations by physician—Notice to minor's parents or guardian or married woman's husband" provides notice to the same persons recognized by the old statute to have an interest in the unborn child. Although it is arguable that the purpose of the notice provision under question is limited by the introductory phrase regarding the best medical judgment of the physician, it is more likely that the Legislature was concerned not only with the health and well-being of the mother, but also with providing at least some protection to the interest of the husband or parents under appropriate circumstances. Further, the 1974 statute retains a majority of the provisions of the 1973 statute. The Legislature modified only those portions thought necessary to render the statute constitutional after this court struck it down last year. Third, it may be argued that the Legislature did not require no-

tice to be given in the case of a pregnant, unmarried 18-year-old woman because technically she has reached her majority.

In defending a constitutional attack on a statute under the strict scrutiny analysis, a state must show an interest of a "compelling" nature. In asserting state interests, states are not limited to only those interests or purposes described in the title, preamble, or text of the statute, but may raise any interests which plausibly and logically are also purposes implicit in the statute. It is deemed sufficient if the attorney general raises such interests in defending the constitutionality of the statute. *See* Gunther, Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection, 86 Harv.L.Rev. 1, 47 (1972). The state argued the husband's interest in its case before this court. We are therefore not precluded from seriously weighing the husband's interest in the "compelling state interest" computation despite any contrary argument raised in connection with the limiting introductory phrase in the text of the statute. I am unable to say at this time that the husband's interest is not a "compelling state interest" which would sustain the notification provision under attack.

Considering only the facts presented by plaintiff's case, it might be argued that the husband here has no interest because he is not the father, and with a divorce pending there may be no future familial relationship to consider. We must consider the husband's interest in this case, however, because the attack on the statute is made in the form of a class action—the plaintiff purporting to represent "a class made up of women

having unwanted pregnancies who desire to abort and terminate said pregnancies. . . ." Our considerations must be broader than plaintiff's specific facts as long as there are possible class action implications respecting all women with unwanted pregnancies.[1]

The plaintiff has failed to meet the dual requirement for a preliminary injunction in this case. Plaintiff has shown neither irreparable injury nor a substantial likelihood of success on the merits. For these reasons, I joined in the order denying preliminary injunctive relief.

## ABSTENTION

■ Abstention is permissible only in narrowly limited special circumstances, but one of the special circumstances is when the challenged state statute is susceptible of a construction by the state courts that would avoid or modify the federal constitutional question. Harrison v. NAACP, 360 U.S. 167, 176–77, 79 S.Ct. 1025, 3 L.Ed.2d 1152 (1959). In Lake Carriers' Ass'n v. MacMullan, 406 U.S. 498, 511, 92 S.Ct. 1749, 1757, 32 L. Ed.2d 257 (1972), a case involving a constitutional challenge to Michigan's Watercraft Pollution Control Act of 1970 in which the Supreme Court sanctioned abstention, the Court quoted Harman v. Forssenius, 380 U.S. 528, 534, 85 S.Ct. 1177, 14 L.Ed.2d 50 (1965) as follows:

Where resolution of the federal constitutional question is dependent upon, or may be materially altered by, the determination of an uncertain issue of state law, abstention may be proper in order to avoid unnecessary friction in federal-state relations, interference with important state functions, tenta-

---

1. Even if only plaintiff's facts were being considered, the court is concerned about the precedent that might be set if it were to rule that a woman who was pregnant by one other than her husband was not factually under the Utah statute and would therefore secure an abortion without notification being given to her husband. Would this allow a woman to circumvent the requisites of the Utah abortion statute merely by secretly alleging to her physician that the pregnancy was conceived by one other than her husband? If a valid interest in the husband exists, it should not be defeated by an *ex parte* representation of spousal infidelity.

tive decisions on questions of state law, and premature constitutional adjudication. . . . The doctrine . . . contemplates that deference to state court adjudication only be made where the issue of state law is uncertain.

Following this rationale, a three-judge court in our circuit abstained last year in an abortion case. Judges Holloway, Barrow and Eubanks considered the constitutionality of the Oklahoma criminal abortion statutes and related laws in Henrie et al. v. Derryberry et al., D.C., 358 F.Supp. 719 (1973). They found several of the abortion provisions unconstitutional; however, regarding the Oklahoma statute prohibiting the destruction of a quick child, that court said:

> We must, however, recognize the right of the State courts to construe or limit the statute so as to save its constitutionality. Id. at 726.
>
> \*   \*   \*   \*   \*   \*
>
> Abstention by the Federal courts is most appropriate where, as here, the State law is uncertain and susceptible of a construction that would avoid or modify the federal constitutional issue. Id.

■ It is apparent that there are possible constructions of the provision in question which would avoid a constitutional confrontation. I, therefore, would abstain for the state courts to decide the questions, including the determination of a class action, presented by this case.

LEWIS, Chief Judge (concurring).

■■ Each of my fellow judges has chosen to write at some length in this case and has arrived at a different conclusion from reasoning bound to the extreme and opposite ends of the spectrum concerning the emotional and agonizing subject of abortion. Judge Anderson has earlier joined with me in an order denying temporary injunctive relief to plaintiff and I now agree with and join Judge Anderson in holding that the

court should abstain from entering a declaratory judgment. The basic problem here is the interpretation of a state statute which, absent exceptional circumstances, should be left to and is the responsibility of the state courts. So, too, it is not desirable to issue declaratory or advisory comments and views of an anticipatory nature as a fore-guess on matters presently pending before the Supreme Court of the United States. However, in deciding to deny injunctive relief and thereafter abstain, the members of the court have necessarily had to consider some unsettled areas in the field of abortion and I consider it necessary to express, largely by summary, the areas in which I agree and disagree with my Brothers where the particular posture of this case requires it.

■ 1. I do not accept the claim that there is a rational connection between the statutory requirement that the doctor notify the husband of the wife's impending abortion and the doctor's duty to exercise his considered medical judgment as to whether to perform the abortion. If it is necessary or even desirable for the doctor to consult with the husband that fact is not apparent on the statute's face nor is there any evidence in this record to establish it. Nor do I accept in any way as desirable that it should be the statutory duty of the doctor to notify the husband of his wife's condition. This duty, if such it be, lies with the wife and when imposed upon the doctor would seem to project him very personally into a family situation unrelated to his professional commitment to his patient. Such a burden might well act as a deterrent to his willingness to perform the operation, and were this "chilling effect" established by expert testimony it might well invalidate the statute. Thus I consider the subject statute to be faulty in this regard. However, I do not deem this factor determinative of the case. Here, it was stipulated that the doctor was *willing* to notify the husband, absent the wife's objection. To me, the doctor's *willing-*

*ness* was a prime factor leading to my vote to deny injunctive relief.

■ 2. I reject entirely the premise that any legal significance attaches to the claim of plaintiff that she became pregnant by someone other than her husband. She volunteered this information to her doctor who, in turn, had no statutory obligation to reveal that information to anyone. I see no violation of the confidential doctor-patient relationship in this regard nor any side effect of criminal prosecution under state law. Every *unmarried* woman who receives an abortion must admit to her doctor an earlier act in violation of state law. Here, the revelation of adultery is no different. The more basic question is whether the woman has to reveal the fact of her marriage at all and the Supreme Court has settled this matter. In Doe v. Bolton, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201, it was specifically held that the woman's familial situation was a proper medical consideration in the formation of a considered medical judgment.

■ 3. Finally, I find nothing in any Supreme Court decision that in any way negatives a husband's legal interest in the abortion of his wife. To the contrary, this question has been recognized by the High Court and pending cases have submitted that issue for consideration. The Utah statute does not require the husband to *consent* to the operation. It requires only that he be *notified* of her intent to have an abortion. If the husband has any legal interest in the abortion of his wife, such interest must begin with knowledge of the situation. The Utah statute requires no more and, to me, it would be a constitutional anomaly to hold that such a requirement is patently unconstitutional so as to invali-

date the statute as plaintiff here seeks and to grant immediate relief as requested. I am certainly not prepared to say that a husband has no interest, actual, legal or otherwise, in his wife's abortion.

RITTER, Chief District Judge (dissenting).

The plaintiff is a child under the age of 18, separated from her husband against whom she has filed for divorce. She has had no sexual relationship with her husband since the initial separation, and he is not the father.

She is in the first trimester of her pregnancy, desires an abortion, has requested her physician to perform it, and he, in his best medical judgment, believes the abortion should be performed in the interest of her physical and mental health. He is willing to perform it, but unwilling to risk prosecution as a felon[1] for violation of Section 76–7–304(2), Utah Code Annotated (1974), and has told plaintiff he will not perform the abortion without informing her husband of her intent to obtain it. She has directed her doctor not to inform her husband.

The Utah Legislature first requires that "No abortion may be performed in this state without the concurrence of the attending physician, based on his best medical judgment." Section 76–7–303 Utah Code Annotated (1974).

And now, the Legislature has added another requirement, "To enable the physician to exercise his best medical judgment, he shall . . . Notify, if possible, the parents or guardian of the woman upon whom the abortion is to be performed, if she is a minor or the husband of the woman, if she is married." Section 76–7–304(2).

---

1. "Any person who performs, procures or supplies the means for an abortion other than authorized by this chapter is guilty of a felony of the second degree", and subject to a prison term of up to fifteen years or a fine of up to $10,000. Utah Code Ann. §

76–7–314 (Laws of Utah 1974), and §§ 76–3–203, 76–3–301 (Laws of Utah 1973). The violation by a physician may also be basis for disciplinary action for unprofessional conduct. See Utah Code Ann. (1953) §§ 58–12–35 and 58–1–25.

Note the phrase: "To enable the physician to exercise his best medical judgment, he shall . . . Notify," etc. No evidence was offered remotely tending to show anything at all the husband could supply to assist the physician. On the contrary, as we shall see.

Two of the judges of this court have denied plaintiff injunctive relief on the ground: "It appears that the plaintiff is not deprived from obtaining the abortion she seeks except by her own decision . . . .. The plaintiff has directed the physician not to inform her husband of the desired abortion. Under these circumstances the court does not believe a conclusion of irreparable injury is justified."

From this "Order" I dissent for the reasons hereinafter set out, including the reason that the statement of the facts stipulated to is incomplete, misleading, and legally insufficient.

These judges say, the girl has the "key" to obtain an abortion. She has a key all right—a key to her own special brand of hell, which the legislature has cunningly contrived for her.

It is clear as the bright sunlight on a summer's day what the husband in such a situation as the present will do. The girl is suing him for divorce, presumably making the usual demands: support money, property settlement, and findings that he wronged her. He will fight back, and the families, friends and acquaintances will choose up sides.

Into this fray, with an atmosphere already highly charged, the girl's physician drops news, not less explosive than TNT: "Your wife is pregnant by another man and wants an abortion."

The result is inevitable, immediate, catastrophic, and terribly destructive. Common knowledge tells us, and the woman, such news is published in the court proceedings, and is ferreted out and spread far and wide through the sensational newspapers and broadcasters.

She will feel in her heart, as did Hester Prynne,[2] the

"whole dismal severity of the puritanic code of law." She "underwent an agony * * * as if her heart had been flung into the street for them all to *spurn and trample* upon." (pp. 60 and 63–64. Emphasis added.)

---

"The grim beadle now made a gesture with his staff. 'Make way, good people, make way, in the King's name!' cried he. 'Open a passage, and, I promise ye, Mistress Prynne shall be set where man, woman, and child may have a fair sight of her * * * from this time till an hour past meridian. A blessing on the righteous Colony of the Massachusetts, where iniquity is dragged out into the sunshine! Come along Madam Hester, and show your scarlet letter in the market place!'" (p. 63.)

---

" 'Truly, friend; and methinks it must gladden your heart, after your troubles and sojourn in the wilderness,' said the townsman, 'to find yourself, at length, in a land where iniquity is searched out, and punished in the sight of rulers and people; as here in our godly New England.'" (p. 71.)

---

" 'Now, good Sir, our Massachusetts magistracy * * * in their great mercy and tenderness of heart, they have doomed Mistress Prynne to stand only a space of three hours on the platform of the pillory, and then and thereafter, for the remainder of her natural life, to wear a mark of shame upon her bosom.'" (p. 72.)

---

"There can be no outrage, methinks, against our common nature—whatever be the delinquencies of the individual —no outrage more flagrant than to

2. Nathaniel Hawthorne, *The Scarlet Letter*, New York: Random House, Inc. (1950).

forbid the culprit to hide his face for shame; as it was the essence of this punishment to do." (p. 64.)

It is "wronging the very nature of woman to force her to lay open her heart's secrets in such broad daylight and in the presence of such a multitude." (p. 75.)

---

"The voice which had called her attention was that of the reverend and famous John Wilson, the eldest clergyman of Boston, a great scholar like most of his contemporaries in the profession, and withal a man of kind and genial spirit. This last attribute, however, had been less carefully developed than his intellectual gifts, and was, in truth, rather a matter of shame than self-congratulation with him. There he stood, with a border of grizzled locks beneath his skullcap, while his gray eyes, accustomed to the shaded light of his study, were winking, like those of Hester's infant, in the unadulterated sunshine. He looked like the darkly engraved portraits which we see prefixed to old volumes of sermons; and had no more right than one of those portraits would have, to step forth, as he now did, and meddle with a question of human guilt, passion and anguish." (pp. 74–75.)

---

"The other eminent characters by whom the chief ruler was surrounded were distinguished by a dignity of mien belonging to a period when the forms of authority were felt to possess the sacredness of Divine institutions. They were, doubtless, good men, just, and sage. But, out of the whole human family, it would not have been easy to select the same number of wise and virtuous persons who should be less capable of sitting in judgment on an erring woman's heart, and disentangling its mesh of good and evil, than the sages of rigid aspect towards whom Hester Prynne now turned her face." (p. 74.)

This is the price the plaintiff has to pay for her abortion. The Utah statute exacts it. She must give up her right of privacy.

This is the right of privacy which the United States Supreme Court held was "founded in the Fourteenth Amendment's concept of *personal liberty* and restriction upon state action", and which the Court held "is broad enough to encompass a woman's decision whether or not to terminate her pregnancy." Roe v. Wade, 410 U.S. 113, at page 153, 93 S. Ct. 705, at page 727, 35 L.Ed.2d 147 (1973). (Emphasis added.)

This is the right of privacy of which the Court said in Eisenstadt v. Baird, 405 U.S. 438, at page 453, 92 S.Ct. 1029, at page 1038, 31 L.Ed.2d 349 (1972):

"If the right of privacy means anything, it is the right of the individual, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child."

And, this is the right of privacy which was held constitutionally protected by the United States Court for the District of Utah in Doe v. Rampton, 366 F.Supp. 189 (D.Utah, 1973). We there declared the predecessors to this statute Sections 76–7–303, 76–7–304, and 76–7–305 Utah Code Ann. (1973), which required the consent of the husband or parents to an abortion, "unconstitutional and totally void." [3]

---

3. Lewis, Chief Judge: "Accordingly, and for the reasons stated by my brothers, I agree that sections *303, 304, 305,* 307, 308, 311, 314, and 316 are unconstitutional and totally invalid." 366 F.Supp. at 199.
Ritter, Judge: "Section 76–7–304 is invalid because it subjects exercise of the individual right of privacy of the mother, in all abortions at all stages of pregnancy, to the consent of others." 366 F.Supp. at 193.
Anderson, Judge: "I concur with the majority in striking the following sections: part of 303, and *all of 304,* 305, 307, 308, 309, 311, 314 and 316." 366 F.Supp. at 200.

The decision of the three-judge federal district court should have been followed here on the principle of *stare decisis*.

■ The state legislature has attempted, in the section under consideration, to inform a physician that he must, to exercise his best clinical judgment, notify the parents or husband of a woman who seeks an abortion. On the face of this statute it is clear that this notification requirement is without any rational basis and is not in any sense connected with the exercise by a physician of his best medical judgment. It is really an attempt to inform the physician by law what shall be his medical judgment based on factors which are non-medical in nature. It applies to all abortions, at all stages of pregnancy.

This is clearly unconstitutional and void in the first two trimesters of pregnancy under the decision of the Supreme Court in Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).

Section 76–7–304(2), Utah Code Annotated (1974), creates an overbroad regulation of a constitutionally protected right, that is, the right of privacy which encompasses both the right of the privacy of the woman to decide to have an abortion on her own without regulation by the State and her right to a doctor-patient relationship free of regulation by the State in the exercise of this constitutionally protected right. Doe v. Bolton, 410 U.S. 179, 183, 191–200, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973).

The Supreme Court of the United States held that in regulating the exercise of a constitutionally protected right which is fundamental in nature such as is true in the instant case, the regulation must be on the basis of a "compelling state interest," 410 U.S. at 155, 93 S.Ct. at 728. Any regulation of this fundamental interest must be "narrowly drawn to express only the legitimate state interests at stake," 410 U.S. at 155, 93 S.Ct. at 728. There is no compelling state interest at stake in requiring notification of any person in regard to the decision to perform an abortion. This statute is an attempt to effectuate indirectly what could not be done directly. The attempt by the Legislature of the State of Utah to require the consent of persons other than the doctor and his patient to the abortion was struck down as being constitutionally invalid. Doe v. Rampton, 366 F.Supp. 189 (D.Utah, 1973). The challenged statute is an attempt to do indirectly what was declared could not be done directly.

The Supreme Court held in regard to the first trimester:

". . . for the period of pregnancy prior to this 'compelling' point, the attending physician in consultation with his patient, is free to determine, *without regulation by the State,* that in his medical judgment, the patient's pregnancy should be terminated. If that decision is reached, the judgment may be effectuated by an abortion *free of interference by the State.*" (emphasis added) 410 U.S. at 163, 93 S.Ct. at 732.

The Court stated in regard to the second trimester:

"With respect to the State's important and legitimate interest in the health of the mother, the 'compelling' point, in the light of present medical knowledge, is at approximately the end of the first trimester . . . It follows that, from and after this point, a State may regulate the abortion procedure to the extent that the regulation reasonably relates to the preservation and protection of maternal health. Examples of permissible state regulation in this area are requirements as to the qualifications of the person who is to perform the abortion; as to the licensure of that person; as to the facility in which the procedure is to be performed, that is, whether it must be a hospital, or may be a clinic or some other place of less-than-hospital status; as to the licensing of the facility and the like." 410 U.S. at 163, 93 S.Ct. at 732.

The provisions of Section 76–7–304(2), Utah Code Annotated (1974), require the plaintiff to incriminate herself. If her physician carries out the directives of that statute and informs her estranged husband that she desires an abortion, he will then be in a position to bring charges against her by her own admission, pursuant to the provisions of Section 76–7–103 or Section 76–7–104, Utah Code Annotated (1974). He would be made aware of the fact that the child she was expecting would not to be his own. This is clearly contrary to the provisions of the Fifth and Fourteenth Amendments to the Constitution of the United States of America.

Among the other vices of this statute are that in all abortions and all stages of pregnancy the woman, in order to obtain an abortion, must surrender her doctor-patient privilege of confidentiality, and as well her privilege against self-incrimination protected by the Fifth and Fourteenth Amendments to the Constitution of the United States. Nothing could be more clearly unconstitutional and utterly void.

Plaintiff has been most grievously injured, and not at all of her own choosing. I am afraid my brothers, on this court, have gone the legislature one better. I see nothing in Roe v. Wade or Doe v. Bolton that permits the woman's right to an abortion in the first trimester to be conditioned upon a showing of "irreparable injury". All that the Supreme Court requires is that she, with her physician, decides she should have an abortion.

Let us see clearly what the United States Supreme Court is telling us: This is a free country in which people can make their own decisions. There is nothing in what the Supreme Court said that forces a woman to have an abortion and there is nothing that forces a doctor to perform an abortion.

All the Supreme Court held is that the woman and her doctor, in the first trimester, are permitted to follow their consciences in this matter without having their consciences dictated by the state legislature.

What the Justices are saying is: We think in this situation neither side has the right to force its position on the other side.

The Supreme Court protects the right of the woman; and what the Justices say is quite clear: There is a fundamental basic right, personal to the woman, to decide whether and when to have a child.

The Court relies upon the integrity of the doctor and the natural solicitude of the mother for her babe.

The old abortion law was a drastic constitutional invasion of the rights of human beings, namely, women, who were compelled to go through with a pregnancy, which is a form of involuntary servitude.

And there is something terribly wrong about compulsory pregnancy in a society where men and women are supposed to have freedom of choice, and a right of privacy, constitutionally guaranteed.

The Supreme Court in these decisions is not forcing anything on anybody. The decision is a declaration of freedom of choice—a declaration of independence for women. And that seems to me to be a mighty good point of view this year, being the 355th since the landing of the Puritans in Massachusetts, and the eve of the 200th anniversary of the signing of the Declaration of Independence.

It is high time we learned the lessons from Salem Village and the Massachusetts Bay Colony. They have more than antiquarian interest for us today. Three hundred years is long enough.

The court should find the provisions of Section 76–7–304(2), Utah Code Annotated (1974) unconstitutional and void and their enforcement should be restrained.

## DISSENTING FROM THE COURT'S ABSTENTION IN C 74–344

This is an action for injunctive and declaratory relief as authorized by 42

U.S.C. § 1983 to secure rights, privileges and immunities established by the Fifth and Fourteenth Amendments to the United States Constitution. The plaintiff seeks an injunction to restrain the defendants, their agents, employees, and successors in office from applying, enforcing and implementing Utah Code Ann. § 76–7–304(2) (1974), hereinafter called the notice-requirement provision of Utah's anti-abortion statutes. For the reasons discussed above, I believe that the notice-requirement provision constitutes an invalid and overreaching interference with the right of privacy, attempts unlawfully to regulate the relationship between the plaintiff and her physician in violation of the Supreme Court's holdings in Roe v. Wade, supra, and Doe v. Bolton, supra, and forces the plaintiff to take actions which may tend to incriminate her in violation of the Fifth and Fourteenth Amendments.

My two associates earlier joined in an order denying temporary injunctive relief to the plaintiff and now join in holding that the Court should abstain from entering a declaratory judgment. My reasons for dissenting from the denial of injunctive relief are set forth above. I shall now set forth my reasons for dissenting from the order of abstention.

Although a number of opinions of the United States Supreme Court, the Courts of Appeals and federal district courts approve the so-called "abstention doctrine" whereby federal courts refuse to adjudicate the constitutionality of state statutes until state courts have been afforded an opportunity to pass upon them, I believe that this case does not present a proper context for abstention.

In 1821 in the famous case of Cohens v. Virginia, 6 Wheat. 264, 403, 5 L.Ed. 257, Chief Justice Marshall stated, with singular force:

It is most true, that this court will not take jurisdiction if it should not: but it is equally true, that it must take jurisdiction, if it should. The judiciary cannot, as the legislature may, avoid a measure, because it approaches the confines of the constitution. We cannot pass it by, because it is doubtful. With whatever doubts, with whatever difficulties, a case may be attended, we must decide it, if it be brought before us. We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given. The one or the other would be treason to the constitution. Questions may occur, which we would gladly avoid; but we cannot avoid them. All we can do is, to exercise our best judgment, and conscientiously to perform our duty.

In the present case the plaintiff and an Assistant Attorney General of the State of Utah were properly before the Court, prepared to litigate the constitutionality of the notice-requirement provision. However, each of my fellow judges chose to "decline the exercise of jurisdiction which is given" and, in effect, invited the plaintiff, who was entering the second trimester of her pregnancy, to pursue her constitutional claim in state courts. In this regard I am persuaded that Justice Douglas has stated the better view:

I think the federal courts, created by the First Congress, are today a haven where rights can sometimes be adjudicated even more dispassionately than in state tribunals. At least Congress in its wisdom has provided since 1875 (18 Stat. 470) that the lower federal courts should be the guardian of federal rights. . . . And in my view there is no more appropriate tribunal for an adjudication of that issue than the Federal District Court . . . This is not intermeddling in state affairs nor creating needless friction. It is an authoritative pronouncement at the beginning of a controversy which saves countless days in the slow, painful, and costly litigation of separate individual lawsuits . . . Martin v. Creasy, 360 U.S. 219, 79 S.

Ct. 1034, 3 L.Ed.2d 1186 (Douglas, J., dissenting in part), 228–29, 79 S.Ct. 1039 (1959).]

In the present case my associates seem to believe that because a state law has been challenged in federal court, the state courts should first be called upon to give the law some construction which might save it. However, they disagree about why the abstention should be invoked, as well as about which construction the state courts might give to the notice-requirement provision in order to save it.

Judge Anderson believes that the notice-requirement provision may have a valid medical justification and also may protect the father's and parents' interest in the fetus. Judge Lewis explicitly rejects the alleged medical justification, but not the alleged protection of the husband's interest. In this case, however, the estranged husband against whom a divorce action was pending was not the father of the plaintiff's child. It is difficult to see what interest he may have in the fetus, except perhaps to raise its existence as a shield or as a sword in the divorce proceedings.

Judge Anderson believes that "Abstention is permissible *only* in narrowly limited special circumstances . . .", whereas Judge Lewis believes that "a state statute . . ., *absent* exceptional circumstances, should be left to and is the responsibility of the state courts." (Emphasis is added.) However, Justice Frankfurter, concurring in the result but dissenting from the abstention rationale in Alabama Public Service Commission v. Southern Railway, 341 U.S. 341, 360–61, 71 S.Ct. 762, 774, 95 L.Ed. 1002, stated:

> Equity by its very nature denies relief if, on balance of considerations relevant to equity, it would be inequitable to grant the extraordinary remedy of an injunction. Federal courts of equity have always acted on this equitable doctrine. But it was never a doctrine of equity that a federal court should exercise its judicial discretion to dismiss a suit merely because a State court could entertain it.
>
> This is so because discretion based solely on the availability of a remedy in State courts would for all practical purposes repeal the Act of 1875. This Act gave to the federal courts a jurisdiction not theretofore possessed so that a State could not tie up a litigant making such a claim by requiring that he bring suit for redress in its own courts. That jurisdiction was precisely the jurisdiction to hear constitutional challenge to local action on the basis of the vast limitations placed upon state action by the Civil War amendments . . .

I regret my inability to make clear to the majority of this Court that its opinion is in flagrant contradiction with the unbroken course of decisions in this Court for seventy-five years.

Justice Douglas in his dissenting opinion in Harrison v. N.A.A.C.P., 360 U.S. 167, 179–81 and 184, 79 S.Ct. 1025, 1031, 3 L.Ed.2d 1152, criticises the use of the abstention doctrine in cases which arise under the Civil Rights Act. His criticism is clearly applicable to my associates' abstention in the present case:

> The rule invoked by the Court to require the Federal District Court to keep hands off this litigation until the state court has construed these laws is a judge-made rule. It was fashioned in 1941 in the decision of Railroad Commission of Texas v. Pullman Co., 312 U.S. 496 [61 S.Ct. 643, 85 L.Ed. 971], as a *device to avoid needless friction under the Federal Constitution* where a resolution of state law questions might make those adjudications unnecessary. Since that time, the rule of the Pullman case has been greatly expanded. It has indeed been extended so far as to make the presence in federal court litigation of a state law question a convenient excuse for requiring the federal court to hold its hand while a second litigation is

undertaken in state court. This is a delaying tactic that may involve years of time and that inevitably doubles the cost of litigation. When used widespread, it dilutes the stature of the Federal District Courts, making them secondary tribunals in the administration of justice under the Federal Constitution.

With all due respect, this case seems to me to be the most inappropriate one of all in which to withhold the hand of the Federal District Court. Congress has ordained in the Civil Rights Act that . . . "Every person who, under color of any statute . . . subjects, or causes to be subjected, any citizen of the United States or other person . . . to the deprivation of any rights . . . secured by the Constitution and laws (is subjected to suit) . . . ." 42 U.S.C. § 1983; and has given the District Courts "original jurisdiction" of actions "to redress the deprivation, under color of any State law, . . . of any right . . . secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens . . . ." 28 U.S.C. § 1343. The latter section was invoked here. From the time when Congress first implemented the Fourteenth Amendment by the comprehensive Civil Rights Act of 1871 the thought has prevailed that the federal courts are the unique tribunals which are to be utilized to preserve the civil rights of the people. Representative Dawes, in the debate on the 1871 bill, asked "what is the proper method of thus securing the free and undisturbed enjoyment of these rights?" Looking to the Act which eventually became law he answered, "The first remedy proposed by this bill is a resort to the courts of the United States. Is that a proper place in which to find redress for any such wrongs? If there be power to call into the courts of the United States an offender against

these rights, privileges and immunities; and hold him to account there, I submit . . . that there is no tribunal so fitted, where equal and exact justice would be more likely to be meted out in temper, in moderation, in severity, if need be, but always according to the law and fact, as that great tribunal of the Constitution." Cong. Globe, 42d Cong., 1st Sess. 476 (1871).

It seems plain to me that it was the District Court's duty to provide this remedy, if the appellees, who invoked that court's jurisdiction under the Civil Rights Act, proved their charge that the appellants, under the color of the Virginia statutes, had deprived them of civil rights secured by the Federal Constitution.

\*   \*   \*   \*   \*   \*

We need not—we should not—give deference to a state policy that seeks to undermine paramount federal law. We fail to perform the duty expressly enjoined by Congress on the federal judiciary in the Civil Rights Acts when we do so.

In the present case my associates join in abstaining from deciding what they believe to be solely a matter of state law. Without retaining any jurisdiction whatsoever, they dismiss the case and invite the plaintiff to litigate her constitutional claim in state courts, but give her no assurance that she can get expeditious determination of her claim in state courts. They ignore the facts that the plaintiff was beginning her second trimester of pregnancy and that any state court litigation would take time— perhaps a great deal of time. In the present case we are not called upon to decide anything like "a constitutional challenge to Michigan's Watercraft Pollution Control Act of 1970", discussed by Judge Anderson in his opinion. In such a case a delay in obtaining a decision on the merits is not especially crucial. Here, however, we were called upon to decide whether a particular woman can have an abortion in Utah during the first trimester of pregnancy without

state interference. In this case a delay in obtaining a decision on the merits will have extraordinary consequences. It may be good policy to abstain in the Watercraft Pollution Control Act case, but it is unconscionable to abstain in the case before this Court.

One of the principal costs of the abstention doctrine is the prolonged delay it often brings in its wake. For example, the use of the doctrine kept the Spector case in the federal courts for almost a decade. See Spector Motor Service v. McLaughlin, 323 U.S. 101, 65 S.Ct. 152, 89 L.Ed. 101 (1944) (decision requiring abstention), and Spector Motor Service v. O'Connor, 340 U.S. 602, 71 S. Ct. 508, 95 L.Ed. 573 (1951) (decision on the merits.) In United States v. Leiter Minerals, Inc., 381 U.S. 413, 85 S.Ct. 1575, 14 L.Ed.2d 692 (1965), the case was dismissed as moot eight years after abstention was ordered.

Justice Douglas' experience with abstention caused him to reexamine completely the doctrine in England v. Louisiana State Board of Medical Examiners, 375 U.S. 411, 423, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964) (concurring opinion). He would scrap the doctrine on the grounds that it necessitates multiple law suits, increases the costs and time period of litigation, undermines federal jurisdiction especially in civil rights cases, and creates procedural traps for the unwary.

In the recent case of Harris County Commissioners Court et al. Moore, 420 U.S. 77, 95 S.Ct. 870, 875, 43 L.Ed.2d 32 (1975), in which the Supreme Court reviewed and applied the abstention doctrine, the Court said:

We have repeatedly warned, however, that because of the delays inherent in the abstention process and the danger that valuable federal rights might be lost in the absence of expeditious adjudication in the federal court, abstention must be invoked only in "special circumstances", see Zwicker v. Koota, 389 U.S. 241, 248 [88 S.Ct. 391, 395, 19 L.Ed.2d 444] (1967), and only upon careful consideration of the facts of each case. Baggett v. Bullitt, 377 U.S. 360, 375–379, 84 S.Ct. 1316, 1324–1327, 12 L.Ed.2d 377 (1964); Railroad Comm'n v. Pullman Co., *supra,* 312 U.S. [496] at 500 [61 S.Ct. 643, at 645, 85 L.Ed. 971].

In the present case, "because of the delays inherent in the abstention process and the danger that valuable federal rights might be lost in the absence of expeditious adjudication in the federal court", there should have been no abstention. Here, at the time of the hearing on whether temporary injunctive relief should be issued, the plaintiff was beginning her second trimester of pregnancy. Because the interests of the plaintiff and of the State substantially change during the second and third trimesters of pregnancy, and because of the delay necessitated by requiring the plaintiff to initiate proceedings in state courts, there was no feasible alternative to the adjudication of her constitutional claim in this Court. Even a minimal delay in state court adjudication of her claim would create "the danger that valuable federal rights might be lost in the absence of expeditious adjudication in the federal court." Thus, this Court should have proceeded to decide the plaintiff's claim on the merits.

For the reasons stated above, I believe that abstention in this case was an improper exercise of discretion from which I dissent.